Filed 9/2/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Y.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>J.V.,<br><br>   Defendant and Appellant. | D080349<br><br>(Super. Ct. No. J517208D) |

APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia Silva, Acting County Counsel, Caitlin E. Rae, Chief Deputy, Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

J.V. (Father) appeals from a Welfare and Institutions Code section 366.26[1] order terminating his parental rights to his now three-year-old daughter, Y.M.  His sole contention is that the San Diego County Health and Human Services Agency (the Agency) did not comply with its initial duty to inquire regarding Y.M.'s possible Indian ancestry under section 224.2, subdivision (b), which implements in part the federal Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).  The Agency concedes that it did not comply with its section 224.2, subdivision (b) duty of initial inquiry, but argues its error was harmless.  In this opinion, we discuss the various standards of prejudice that have been applied by appellate courts in such cases and adopt the standard set forth in *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*).  Applying that standard to the record in this case, we conclude the Agency's section 224.2, subdivision (b) initial inquiry error was not prejudicial.  Accordingly, we affirm the section 366.26 order.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In October 2019, the Agency filed a section 300, subdivision (b)(1) dependency petition for Y.M., alleging that she was at substantial risk of serious physical harm due to drug abuse by her mother, K.M. (Mother), and domestic violence between Mother and Father in Y.M.'s presence.  In its detention hearing report, the Agency stated that Mother had denied any Indian ancestry and recommended that the juvenile court find that ICWA did

---

1    All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2    Because Father's sole contention on appeal challenges the compliance by the Agency with its section 224.2, subdivision (b) duty of initial inquiry, we limit our discussion of the facts and procedural history to information necessary to determine that issue.

2

not apply to Y.M.'s case. At the detention hearing, Mother's counsel represented that Mother did not claim any Indian ancestry. Mother also filed a form (Form ICWA-020), declaring that she had no known Indian ancestry. The juvenile court found that the Agency had made reasonable inquiry regarding whether Y.M. was, or may be, an Indian child and then found, without prejudice, that ICWA did not apply to her case. The court found that the Agency made a prima facie showing in support of its petition and detained Y.M. in the home of a nonrelative extended family member (NREFM).

In its November jurisdiction and disposition report, the Agency stated that Mother had informed its social worker that she had no Indian ancestry.[3] The Agency had been unable to locate and inquire of Father regarding any Indian ancestry. However, in its April 2020 addendum report, the Agency stated that its social worker had met with Father in March and he had denied any Indian ancestry.

At the contested jurisdiction and disposition hearing in July 2020, the juvenile court found the allegations in the petition to be true, declared Y.M. to be a dependent of the court, and placed her with the NREFM. Although Mother, Father, and the paternal grandmother appeared telephonically at the hearing, there is no indication that the court asked them about any Indian ancestry.

In its six-month review hearing report in January 2021, the Agency stated that Father lived with the paternal grandmother and a paternal uncle. Also, the Agency reported that the paternal grandfather had requested

---

[3] Mother told the Agency social worker that she was raised by the maternal grandmother, who died in 2017. Mother stated that she never met her biological father (i.e., the maternal grandfather), but believed he lived in Mexico.

placement of Y.M. and was participating in its resource family approval (RFA) process.

In its addendum report in May, the Agency stated that the paternal grandfather was being assessed for placement of Y.M. and was participating in supervised visits with her. In its June addendum report, the Agency stated that the paternal grandfather and his wife had not responded to its requests for information in the RFA approval process and that their placement application would be closed if they did not respond within 30 days.

At the contested combined six-month and 12-month review hearing conducted on two days in June and July, the paternal grandmother testified that she wanted to visit with Y.M., but believed she was not allowed to do so. She had asked Father to speak with the Agency social worker about arranging visits for her.[4] The juvenile court terminated reunification services for Mother and Father and set a section 366.26 hearing to select and implement a permanent plan for Y.M.

In its initial section 366.36 report in November, the Agency noted that the juvenile court had previously found that ICWA did not apply to Y.M.'s case at the October 2019 detention hearing. The Agency recommended that the court again find that ICWA did not apply to Y.M.'s case.

At the section 366.26 hearing on March 9, 2022, the juvenile court adopted the Agency's recommended findings. In particular, the court found, without prejudice, that ICWA did not apply to Y.M.'s case. The court terminated the parental rights of Mother and Father, selected a permanent plan of adoption for Y.M., and designated her current caregivers as her prospective adoptive parents. The court then set a postpermanency planning

---

4    In July, the Agency arranged visits with Y.M. for the paternal grandmother.

hearing for September 7.  Father timely filed a notice of appeal, challenging the March 9 order.

DISCUSSION

I

*ICWA Inquiry Duties*

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement.  (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).)  ICWA provides:  "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and their right to intervene.  (25 U.S.C. § 1912(a); see also, *Isaiah W.*, at p. 8.)  California law also requires such notice.  (§ 224.3, subd. (a) ["If a court [or] a social worker . . . knows or has reason to know . . . that an Indian child is involved, notice pursuant to [ICWA] shall be provided for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement . . . ."].)  Both ICWA and California law define an "Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (25 U.S.C. § 1903(4); § 224.1, subds. (a), (b).)

Sections 224.2 and 224.3 set forth California's current ICWA inquiry and notice requirements for juvenile dependency cases.  Under sections 224.2 and 224.3, the Agency and the juvenile court are generally obligated to: (1) conduct an initial inquiry regarding whether there is a reason to believe the child is an Indian child; (2) if there is, then further inquire whether there is a

5

reason to know the child is an Indian child; and (3) if there is, then provide ICWA notice to allow the Indian tribe to make a determination regarding the child's tribal membership. (See *In re D.S.* (2020) 46 Cal.App.5th 1041, 1048-1052; *In re Austin J.* (2020) 47 Cal.App.5th 870, 882-885.)

Section 224.2, subdivision (a) imposes on the juvenile court and the Agency "*an affirmative and continuing duty to inquire* whether a child for whom a petition under Section 300 . . . has been filed, is or may be an Indian child[.]" (Italics added.) Section 224.2, subdivision (b) establishes the Agency's duty of initial inquiry, providing:

> "If a child is placed into the temporary custody of [the Agency] . . . , [the Agency] . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, *extended family memb*ers, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."[5] (Italics added.)

Section 224.2, subdivision (e) imposes a duty of further inquiry, providing:

---

[5] Also, section 224.2, subdivision (c) imposes on the juvenile court the duty to ask each participant at their first appearance in court "whether the participant knows or has reason to know that the child is an Indian child." Although Father cites that statutory duty and argues in a conclusory manner that both the Agency and the juvenile court failed to comply with their duties of initial inquiry, his opening brief does not present a substantive argument showing that the juvenile court failed to comply with its section 224.2, subdivision (c) duty. Therefore, we need not, and do not, decide whether the court failed to comply with its section 224.2, subdivision (c) duty in the circumstances of this case or, if it failed to so comply, whether that error was prejudicial. Nevertheless, we note that the record does not show the juvenile court asked the paternal grandmother about any possible Indian ancestry when she appeared at the contested jurisdiction and disposition hearing in July 2020.

6

> "If the court [or] social worker . . . has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is a reason to know that the child is an Indian child, the court [or] social worker . . . shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable."

Before the juvenile court can find that ICWA does not apply to a child's case, it must make a finding that "due diligence as required in this section [has] been conducted." (§ 224.2, subd. (i)(2).)

We review a juvenile court's findings that the Agency has made reasonable inquiries regarding a child's possible Indian ancestry under ICWA and that the Agency has complied with ICWA's notice requirements, or that no such notice is required, for substantial evidence. (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.)

II

*Noncompliance with Section 224.2, Subdivision (b) Duty of Initial Inquiry*

Father contends, and the Agency agrees, that substantial evidence does not support the juvenile court's finding that ICWA does not apply to Y.M.'s case and, in particular, that substantial evidence does not support its implied finding under section 224.2, subdivision (i)(2) that Agency complied with its duty of initial inquiry under section 224.2, subdivision (b). We agree.

Father asserts, and the Agency acknowledges, that the Agency's initial ICWA inquiry was deficient because it failed to ask Y.M.'s extended family members, including her paternal grandmother and paternal grandfather, about the possibility of her Indian ancestry, despite the fact that the Agency had spoken with them on multiple occasions. The Agency's duty to make an initial inquiry into Y.M.'s possible Indian ancestry applies to "extended family members," which includes the paternal grandmother and paternal

7

grandfather. (§ 224.1, subd. (c) ["extended family member" is defined as provided in 25 U.S.C. § 1903; § 224.2, subd. (b); cf. 25 U.S.C. § 1903(2) [term "extended family member" includes child's grandparents].) The Agency concedes, and we agree, that it failed to comply with its duty of initial inquiry in this case. (Cf. *In re J.C.* (2022) 77 Cal.App.5th 70, 78-79 (*J.C.*) [error in finding ICWA did not apply where agency had regular contact with paternal grandmother and maternal grandmother was readily accessible, but it did not ask them about possible Indian ancestry]; *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 (*Darian R.*) [error in finding ICWA did not apply where agency had contact with maternal aunt and maternal grandfather, but it did not ask them about possible Indian ancestry].) Because substantial evidence does not support the juvenile court's implicit finding that the Agency complied with its duty of initial inquiry under section 224.2, subdivision (b), we conclude the court erred by finding at the March 9, 2022 hearing that ICWA did not apply to Y.M.'s case.

## III

### *Harmless Error*

Father contends that the juvenile court's findings that the Agency complied with section 224.2, subdivision (b) and that ICWA did not apply to Y.M.'s case, which findings we concluded above are not supported by substantial evidence, constitute reversible per se error. Alternatively, he argues that if the error is not reversible per se, then it is prejudicial under the standard set forth in *Benjamin M.*, *supra*, 70 Cal.App.5th 735. The Agency disagrees that the error was reversible per se and was, instead, harmless under any of the three different standards of prejudice adopted by various Courts of Appeal. As discussed below, we conclude that section 224.2, subdivision (b) error is not reversible per se, but instead state law error that

8

requires reversal only if it has caused a miscarriage of justice under California Constitution, article VI, section 13. Interpreting that general standard for prejudicial error in the context of juvenile dependency cases in which the Agency has not complied with its section 224.2, subdivision (b) duty of initial inquiry, we conclude the standard of prejudice set forth in *Benjamin M.*, *supra*, 70 Cal.App.5th 735, is the most appropriate standard. Applying that standard to the record in this case, we conclude Father has not carried his burden on appeal to show the section 224.2, subdivision (b) error was prejudicial and requires reversal of the March 9, 2022 order terminating his parental rights.

## A

At the outset, we note that the error asserted by Father on appeal is one of state law error only (i.e., a violation of § 224.2, subd. (b)) and not one of federal law. Accordingly, we may reverse the March 9, 2022 order only if the error is prejudicial under the state law standard for prejudicial error. Article VI, section 13 of the California Constitution provides: "No judgment shall be set aside . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Generally, that standard of prejudice has been interpreted as requiring an appellant to show that it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the error. (See, e.g., *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We note, and Father and the Agency acknowledge, that there is currently a wide and varied split of authority among the Courts of Appeal regarding the proper standard to apply in determining the prejudicial effect of an agency's failure to comply with its section 224.2, subdivision (b) duty of

initial inquiry. There appear to be at least four main strains of prejudicial error standards that appellate courts have adopted in this context. Until such time that the California Supreme Court addresses this issue, we believe the *Benjamin M.* strain of cases provides the most appropriate standard of prejudice.

1. *Reversible per se standard.* Father asserts that we should adopt, and apply to this case, the reversible per se standard set forth in *In re Y.W.* (2021) 70 Cal.App.5th 542 (*Y.W.*). In that case, the court concluded that the agency did not comply with its section 224.2, subdivision (b) duty of initial inquiry by not making meaningful efforts to locate and interview extended family members for whom it had potential viable leads regarding possible Indian ancestry. (*Y.W.* at pp. 552-553.) *Y.W.* then rejected the agency's argument that its error was harmless because the parents had denied any Indian ancestry and had not represented on appeal that the particular biological relative would provide information indicating that the children were Indian children. (*Id.* at pp. 555-556.) The court stated: "A parent, however, does not need to assert he or she has Indian ancestry to show a child protective agency's failure to make an appropriate inquiry under ICWA and related law is prejudicial. . . . It is unreasonable to require a parent to make an affirmative representation of Indian ancestry where the [agency's] failure to conduct an adequate inquiry deprived the parent of the very knowledge needed to make such a claim." (*Id.* at p. 556.) Accordingly, *Y.W.* concluded: "The [agency's] failure to conduct an adequate inquiry into [the children's] possible Indian ancestry makes it impossible for [the parents] to demonstrate prejudice." (*Ibid.*) Based, in part, on the agency's section 224.2, subdivision (b) initial inquiry error, *Y.W.* conditionally affirmed the orders terminating the parents' parental rights and remanded the matter with

directions that the agency comply with its inquiry and notice duties. (*Y.W.*, at p. 559.) In so doing, it implicitly concluded the agency's error was not subject to harmless error review and was, instead, prejudicial per se (or, in effect, reversible per se), requiring "conditional affirmance" of the orders.[6] (*Ibid.*)

Other courts have cited *Y.W.* and/or similarly concluded that initial inquiry error under section 224.2, subdivision (b) is prejudicial and reversible per se. (See, e.g., *In re E.V.* (2022) 80 Cal.App.5th 691, 693, 698 [reversible

---

[6] Both Father and the Agency interpret *Y.W.*'s language as adopting a reversible per se standard for section 224.2, subdivision (b) initial inquiry error. Because *Y.W.* did not include any language setting forth any requirement of a showing by the appellant that the purported error was prejudicial and instead simply concluded that the inquiry error in that case required remand for compliance with section 224.2, subdivision (b), we agree that the most reasonable reading of *Y.W.* is that the court adopted a reversible per se standard for such error. Although that court subsequently criticized interpretations by other appellate courts that *Y.W.* adopted a reversible per se standard, for purposes of this case we treat *Y.W.*'s language as implicitly adopting a reversible per se standard for prejudicial error. (See, *In re Rylei S.* (2022) 81 Cal.App.5th 309, 325, fn. 13 (*Rylei S.*) [although other appellate courts have interpreted *Y.W.* and its progeny as requiring automatic reversal " 'if any stone is left unturned,' . . . we have never said anything of that sort."].) The *Rylei S.* court conceded that it had "explained that, when the child protective agency's failure to conduct an adequate inquiry makes it impossible for the parent to show prejudice, we will remand for a proper inquiry. [Citations.] But that is a far cry from holding any misstep by the [agency] in the process of investigating a child's possible Indian status will require reversal of a no-ICWA finding." (*Id.* at p. 325, fn. omitted.) Nevertheless, *Rylei S.* concluded that the agency's section 224.2, subdivision (b) error in failing to inquire of extended family members was prejudicial, stating: "Because we do not know what we do not know, nothing more in the way of prejudice need be shown." (*Id.* at p. 324.) Accordingly, it appears the *Rylei S.* court, in effect, confirmed its position in *Y.W.* that section 224.2, subdivision (b) inquiry error is generally reversible per se and requires remand for ICWA compliance.

11

per se error]; *In re A.R.* (2022) 77 Cal.App.5th 197, 206-207 [reversible per se error]; *In re J.C.* (2022) 77 Cal.App.5th 70, 80 [prejudicial per se error, citing *Y.W.*]; *In re H.V.* (2022) 75 Cal.App.5th 433, 438 [reversible per se error]; *In re N.G.* (2018) 27 Cal.App.5th 474, 484 [generally, reversible per se error]; *In re K.R.* (2018) 20 Cal.App.5th 701, 708 [reversible per se error].)

However, we reject the application of a reversible per se standard for section 224.2, subdivision (b) inquiry error because it is inherently inconsistent with the requirement in California Constitution, article VI, section 13 that a miscarriage of justice be shown for reversal. Alternatively stated, a reversible per se standard for state law error, such as that adopted by *Y.W.*, conflicts with, and disregards, the constitutional requirement that an appellate court "examin[e] . . . the entire cause, including the evidence," and then reverse the judgment only if the purported error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) As one court observed, "our State's test for harmlessness is an *outcome*-focused test." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779 (*Dezi C.*).) As *Dezi C.* discussed, there are also other reasons to not adopt a reversible per se standard: (1) it encourages parents to "game the system" by giving them an incentive to not object when they first observe deficiencies in an agency's inquiry and instead wait to raise the error on appeal, causing delay in the finality of a child's dependency case; (2) it "may yield a seemingly endless feedback loop of remand, appeal, and remand;" and (3) it "seemingly elevates ICWA above the constitutional mandate that reversal is required when there would be a miscarriage of justice." (*Id.* at pp. 784-785.) Accordingly, we reject Father's assertion that the Agency's section 224.2, subdivision (b) error in this case is subject to a reversible per se standard.

2. *Presumptive affirmance standard.*  On the other end of the prejudice spectrum of cases is the strain of cases that concludes section 224.2, subdivision (b) inquiry error does not require reversal of an order unless the appellant shows, based on the juvenile court record and any evidence proffered on appeal, that a different outcome is likely to be achieved on remand (i.e., that there is reason to believe the child is an Indian child).  (See, e.g., *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430-1431 (*Rebecca R.*) [inquiry error was harmless where parent did not make affirmative representation of Indian ancestry on appeal]; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1065, 1071 (*A.C.*).)  Under that standard, "a parent asserting failure to inquire must show—at a minimum—that, if asked, he or she would, in good faith, have claimed some kind of Indian ancestry." (*A.C.*, at p. 1069.)  Alternatively stated, that standard requires a parent to show a miscarriage of justice occurred based on the juvenile court record and any offer of proof or affirmative assertion of Indian ancestry on appeal.  (*Ibid.*)

We, like the Agency, disagree with the application of the presumptive affirmance standard of prejudice in section 224.2, subdivision (b) inquiry error cases.  Although, unlike *Y.W.*, that standard generally conforms to our State constitutional requirement for a miscarriage of justice, as discussed above, it nevertheless disregards: (1) the rule that on appeal we generally do not consider matters not contained in the trial court record (see, e.g., *In re Zeth S.* (2003) 31 Cal.4th 396, 400 (*Zeth S.*)); and (2) the fact that a parent may not necessarily know about any Indian ancestry and, absent an agency's compliance with its section 224.2, subdivision (b) duty of inquiry, therefore may not be in a position to make an offer of proof or affirmative representation of Indian ancestry.  First, as the Agency notes, that standard requires an appellate court to consider new evidence and/or representations

13

on appeal in order to determine whether the purported inquiry error was prejudicial. *Zeth S.* stated: "In a juvenile dependency appeal from an order terminating parental rights, may the Court of Appeal receive and consider postjudgment evidence that was never before the juvenile court, and rely on such evidence outside the record on appeal to reverse the judgment? The general answer is no, although in the rare and compelling case an exception may be warranted." (*Id.* at p. 400.) In the context of section 224.2, subdivision (b) inquiry error that has recently been all too common, we believe an exception to *Zeth S.*'s general rule precluding postjudgment evidence is not warranted and, in particular, conclude the instant case is not a "rare and compelling case" for such an exception to apply. (*Id.* at p. 400.) We disagree with *Dezi C.*'s assertion that such proffers in this context should always be allowed and considered in section 224.2, subdivision (b) appeals and are appropriate under Code of Civil Procedure section 909 because they bear on the collateral issue of prejudice rather than on the substantive merits of the appeal. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779, fn. 4; Code Civ. Proc., § 909 ["In all cases where trial by jury is not a matter of right . . . , the reviewing court may make factual determinations contrary to or in addition to those made by the trial court. The factual determinations may be based on the evidence adduced before the trial court either with or without the taking of evidence by the reviewing court. The reviewing court may for the purpose of making the factual determinations or for any other purpose in the interests of justice, take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal . . . ."].)

Second, as noted in *Y.W.*, the presumptive affirmance standard "unreasonabl[y] . . . require[s] a parent to make an affirmative representation of Indian ancestry where the [agency's] failure to conduct an adequate

14

inquiry deprived the parent of the very knowledge needed to make such a claim." (*Y.W.*, *supra*, 70 Cal.App.5th at p. 556.) Likewise, *Benjamin M.* stated: "[I]n any case where information about Indian ancestry is unknown, the probability of such ancestry is reasonable enough to require the agency and court to pursue it. Requiring a parent to prove that the missing information would have demonstrated 'reason to believe' would effectively impose a duty on that parent to search for evidence that the Legislature has imposed on only the agency. A parent challenging ICWA compliance cannot always easily obtain the missing information, even when that missing information is about a parent's possible Indian ancestry." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743, fn. omitted.)

More importantly, the presumptive affirmance standard limits its consideration of prejudice to a showing or representation made by the appellant (e.g., a parent), and, in so doing, disregards the fact that parents are not the only parties with an interest in a child's dependency proceedings. Specifically, Indian tribes that have no notice of the proceedings may also have an interest in the proceedings. (*Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 52 [ICWA " 'recognizes that the tribe has an interest in the child which is distinct from but on parity with the interest of the parents.' "].) Two main purposes of ICWA's requirement of notice to Indian tribes where a court knows, or has reason to know, a child is an Indian child are: (1) to "facilitate a determination of whether the child is an Indian child under ICWA," which determination can only be made by the Indian tribe itself; and (2) to "ensure[] that an Indian tribe is aware of its right to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding involving an Indian child." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 8.) "[T]he right at issue in the ICWA contest is as much an *Indian tribe's*

15

right to 'a determination' of a child's Indian status as it is a right of any sort of favorable outcome for the litigants already in a dependency case." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743.)  Therefore, to require a parent to prove on appeal there likely would have been more favorable outcome absent the error (i.e., that there is reason to believe a child may have Indian ancestry) would frustrate the ICWA federal and state statutory scheme.  (*Id*. at pp. 743-744.)  "[T]he presumptive affirmance rule not only embraces finality at the expense of the tribe's interest in ascertaining accurate determinations of the Indian status of dependent children, but does too little to incentivize agencies to conduct proper inquiries because prejudicially deficient inquiries will go uncorrected if the parent is unwilling or unable to make a meaningful proffer on appeal."  (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 785.)  Accordingly, we decline to adopt the presumptive affirmance standard in determining the prejudicial effect of the Agency's section 224.2, subdivision (b) error in this case.

3.  *Dezi C.'s modified presumptive affirmance (or "reason to believe") standard.*  The Agency asserts that the most appropriate standard of prejudice for section 224.2, subdivision (b) inquiry error is that adopted by the court in *Dezi C.*, *supra*, 79 Cal.App.5th at page 774.  *Dezi C.* described its standard, stating:  "An agency's failure to discharge its statutory duty of inquiry is harmless unless the record contains information suggesting a reason to believe that the children at issue may be 'Indian child[ren],' in which case further inquiry may lead to a different ICWA finding by the juvenile court.  For these purposes, the 'record' means not only the record of proceedings before the juvenile court but also any further proffer the appealing parent makes on appeal."  (*Ibid*.)

16

However, in our view, the *Dezi C.* standard suffers from the same deficiencies as the presumptive affirmance standard does as discussed above. Specifically, as discussed above, the *Dezi C.* standard disregards: (1) the rule that on appeal we generally do not consider matters not contained in the trial court record (see, e.g., *Zeth S.*, *supra*, 31 Cal.4th at p. 400); (2) the fact that a parent may not necessarily know about any Indian ancestry and, absent an agency's compliance with its section 224.2, subdivision (b) duty of inquiry, therefore may not be in a position to make an offer of proof or affirmative representation of Indian ancestry; and (3) disregards the fact that appellant parents are not the only parties with an interest in a child's dependency proceedings (e.g., Indian tribes that have no notice of the proceedings may also have an interest in the proceedings). Accordingly, as we did with the presumptive affirmance standard, we decline to adopt *Dezi C.*'s modified presumptive affirmance (or "reason to believe") standard in determining the prejudicial effect of the Agency's section 224.2, subdivision (b) error in this case. Neither the Agency's quotation of excerpts from *In re Ezequiel G. et al.* (2022) 81 Cal.App.5th 984, which case adopted *Dezi C.*'s standard, nor the Agency's other conclusory arguments in support of the *Dezi C.* standard persuades us to reach a contrary conclusion.

4. *Benjamin M.'s standard of prejudice.* Finally, we address the potential application of the *Benjamin M.* standard in determining whether the Agency's section 224.2, subdivision (b) inquiry error was prejudicial in the circumstances of this case. In *Benjamin M.*, *supra*, 70 Cal.App.5th 735, the court adopted a middle position between the reversal per se and presumptive affirmance standards. (*Id.* at p. 744.) The court described its standard of prejudice, stating:

17

"[I]n ICWA cases, a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but *where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child. . . .* In such cases, courts have generally avoided applying broad, rigid reversal rules and instead focused on *whether the missing information was readily obtainable and whether such information would have shed meaningful light on the inquiry that the agency had a duty to make.*" (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744, italics added.)

In the circumstances of that case, the father never appeared in the juvenile court and was never asked whether he had reason to believe the child was an Indian child. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Furthermore, the agency did not ask extended family members, such as the father's brother and sister-in-law, whether the child had Indian ancestry. (*Ibid*.) *Benjamin M.* concluded that the missing information was both readily obtainable and would likely have shed meaningful light on the question of whether there was reason to believe the child was an Indian child and therefore conditionally reversed the order and remanded for ICWA compliance. (*Id*. at pp. 744, 746.)

Although the *Benjamin M.* standard of prejudice is somewhat amorphous, we nevertheless believe that its standard of prejudice is the closest of the four main strains of prejudice standards, discussed above, to achieving a proper balance of our State constitutional requirement of a miscarriage of justice for reversal and the imposition of appropriate consequences on appeal, in consideration of the rights of parents and Indian tribes, when an agency fails to comply with its section 224.2, subdivision (b) duty of initial inquiry regarding a child's possible Indian ancestry. We also note that both Father and the Agency identify in their briefs the *Benjamin M.* standard as being, in effect, their second choice for the standard of prejudice

to be applied in this case. Accordingly, until such time that the California Supreme Court directs otherwise, we conclude that the *Benjamin M.* standard should be applied in determining the prejudicial effect of an agency's failure to comply with its section 224.2, subdivision (b) duty of initial inquiry.

B

Applying the *Benjamin M.* standard of prejudice to the juvenile court record in this case, we conclude Father has not carried his burden on appeal to show the Agency's failure to comply with its section 224.2, subdivision (b) duty of initial inquiry was prejudicial and requires reversal of the March 9, 2022 order terminating his parental rights. Here, the record shows that both Mother and Father had denied any Indian ancestry. Father lived with the paternal grandmother and a paternal uncle. Also, at one point during the dependency proceedings, the paternal grandfather had requested placement of Y.M., had been participating in its RFA process, and had been visiting with her. At the section 366.26 hearing on March 9, 2022, the juvenile court, based in part on the above information, found, without prejudice, that ICWA did not apply to Y.M.'s case and terminated Father's parental rights.

As Father asserts and the Agency concedes, the Agency clearly failed to comply with its section 224.2, subdivision (b) duty of initial inquiry by not asking extended family members (e.g., the paternal grandmother and paternal grandfather) about possible Indian ancestry. Because the record shows the Agency had multiple contacts with both the paternal grandmother and paternal grandfather, we presume, as Father asserts, that any information those extended family members could have provided to the Agency was "readily obtainable" within the meaning of *Benjamin M.* (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) However, assuming that

19

information was "readily obtainable," we nevertheless conclude the record in this case does not show that readily obtainable information was "likely to bear meaningfully upon whether [Y.M.] is an Indian child" or, alternatively stated, "would have shed meaningful light on the inquiry that the agency had a duty to make." (*Ibid*.)

Importantly, Father lived with the paternal grandmother during the dependency proceedings and therefore presumably could have asked her at any time whether she knew of any possible Indian ancestry. At the contested combined six-month and 12-month review hearing, the paternal grandmother testified that she and Father had a good relationship and everything was going well in the home they shared. Given his close and regular proximity to the paternal grandmother, we presume Father had a motive to ask, and could have easily asked, her about any possible Indian ancestry that may have afforded him additional rights or protection under ICWA. Therefore, we cannot simply adopt Father's conclusory assertion that if the Agency had asked the paternal grandmother about any Indian ancestry, she would have provided information that was likely to bear meaningfully on the question of whether there was reason to believe Y.M. was, or may be, an Indian child. (Cf. *Darian R.*, *supra*, 75 Cal.App.5th at p. 510 [because mother lived with maternal grandfather and maternal aunt, mother did not meet her burden on appeal to show that agency's inquiry of those extended family members "would have meaningfully elucidated the children's Indian ancestry"].)

Also, because during the dependency proceedings the paternal grandfather had sought placement of Y.M., he presumably would have had a strong incentive to raise any Indian ancestry in support of that goal, but he did not do so. (Cf. *In re S.S.* (2022) 75 Cal.App.5th 575, 582 [because maternal grandmother sought placement of child, she would have strong

incentive to raise any "facts that suggest that [child] is an Indian child"].) Therefore, we likewise conclude that Father has not carried his burden to show that if the Agency had asked the paternal grandfather about any Indian ancestry, that he would have provided information that was likely to bear meaningfully on the question of whether there was reason to believe Y.M. was, or may be, an Indian child. (*Ibid.*)

Accordingly, given Mother's and Father's denials of any Indian ancestry and our conclusion above that had the Agency asked the paternal grandmother and paternal grandfather about any possible Indian ancestry their information was not likely to bear meaningfully on the question of whether there was reason to believe Y.M was, or may be, an Indian child, we conclude the Agency's failure to comply with its section 224.2, subdivision (b) duty of initial inquiry is harmless error. (*Benjamin M.*, *supra,* 70 Cal.App.5th at p. 744.)

Father's conclusory arguments to the contrary do not persuade us to reach a different result. Likewise, none of the cases cited by Father are factually apposite to this case or otherwise persuade us to reach a contrary conclusion. (See, e.g., *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 745 [because father never appeared and was not asked by agency about any Indian ancestry, information that agency could have readily obtained from paternal relatives was likely to bear meaningfully on whether child was Indian child].) Father simply speculates that the paternal grandmother and paternal grandfather would have provided the Agency with information that was likely to bear meaningfully on the question of whether there was reason to believe Y.M was, or may be, an Indian child. By so arguing, he has not carried his burden on appeal to show prejudicial error.

DISPOSITION

21

The March 9, 2022 order is affirmed.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

BUCHANAN, J.